IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-889-D

| | |
|---|---|
| OPTIMA TOBACCO CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| U.S. FLUE-CURED TOBACCO ) | |
| GROWERS, INC., and UETA, INC., ) | |
| ) | |
| Defendants. ) | |

On November 9, 2016, Optima Tobacco Corporation ("Optima Tobacco" or "plaintiff") filed a complaint against U.S. Flue-Cured Tobacco Growers, Inc. ("U.S. Flue-Cured") and UETA, Inc. ("UETA"; collectively, "defendants") for breach of contract [D.E. 1, 8]. On November 30, 2018, defendants moved for summary judgment [D.E. 90, 92] and filed memoranda in support [D.E. 91-1, 93], a joint statement of material facts [D.E. 91-2], and appendices [D.E. 91, 94]. On December 21, 2018, Optima Tobacco responded in opposition [D.E. 97-1] and filed a counter-statement of material facts [D.E. 97-2] and an appendix [D.E. 97]. On January 4, 2019, defendants replied [D.E. 100–102]. As explained below, the court grants in part and denies in part defendants' motions for summary judgment and dismisses U.S. Flue-Cured from the action.

I.

Optima Tobacco is a Florida corporation that brokers or distributes tobacco products, but does not manufacture its own products. See [D.E. 91-2] ¶ 14; Judge Dep. [D.E. 91-68] 23. James Judge ("Judge") and Daniel Makepeace ("Makepeace") own Optima Tobacco. See [D.E. 91-2] ¶ 14; Judge Dep. [D.E. 91-68] 7. Judge runs Optima Tobacco from his home. See [D.E. 91-2] ¶ 14; Judge Dep. [D.E. 91-68] 23. U.S. Flue-Cured is a North Carolina corporation that makes private-label cigarettes and other tobacco products. See [D.E. 91-2] ¶ 11; [D.E. 40] ¶¶ 1–2. UETA is a

Panama corporation that sells cigarettes and other products in duty-free stores in both North and South America. See [D.E. 91-2] ¶ 13; [D.E. 39] ¶¶ 1–3.

In 2007, Aaron Gewirtz ("Gewirtz") called Judge on UETA's behalf to find a manufacturer to make private-label cigarettes for UETA to sell. See [D.E. 91-2] ¶ 15; Ex. 40 [D.E. 91-31] 11–12; Ex. 39 [D.E. 91-30] ¶ 20; Judge Dep. [D.E. 91-68] 11, 13. Judge contacted Stephen Daniel ("Daniel"), the Executive Vice President of U.S. Flue-Cured in 2007, about the business opportunity. However, Judge did not disclose that UETA would be the ultimate distributor. See [D.E. 97-2] ¶ 16; Daniel Dep. [D.E. 91-72] 11–12. Daniel responded positively to Judge because collecting payment from Optima Tobacco would be less risky than attempting to collect payment directly from a foreign distributor, like UETA. See Daniel Dep. [D.E. 91-72] 11–13.

Two oral contracts resulted. See [D.E. 91-2] ¶ 17. UETA orally agreed to order private-label cigarettes from Optima Tobacco. See id.; Judge Dep. [D.E. 91-68] 17. Once UETA had placed an order with Optima Tobacco, Optima Tobacco would send a manufacturing order to U.S. Flue-Cured. See [D.E. 91-2] ¶ 17. U.S. Flue-Cured would manufacture the cigarettes and sell them to Optima Tobacco, which would then resell the cigarettes to UETA. See id. Although Optima Tobacco initially handled shipping, UETA soon handled all shipping itself. See id.; Judge Dep. [D.E. 91-68] 24. Optima Tobacco paid U.S. Flue-Cured $1.85 per carton and paid Gewirtz $0.06 per carton as a commission. See [D.E. 91-2] ¶ 19. UETA paid Optima Tobacco $2.16 per carton. See id. Moreover, UETA paid Optima Tobacco before Optima Tobacco paid U.S. Flue-Cured. See [D.E. 97-2] ¶ 24.

From 2007 to 2012, Optima Tobacco grossed approximately $0.25 per carton under the oral contracts. Cf. [D.E. 91-2] ¶ 19. Optima Tobacco occasionally negotiated price increases from UETA so that it could pay U.S. Flue-Cured more while maintaining its margin. See id.; Judge Dep. [D.E. 91-68] 25–26. However, neither UETA nor U.S. Flue-Cured knew how much profit Optima Tobacco was earning, and UETA and U.S. Flue Cured did not deal with each other directly. See

2

[D.E. 91-2] ¶ 20; Ex. 40 [D.E. 91-31] 11–12. During this time-period, the twin oral contracts were terminable at will. See [D.E. 91-2] ¶ 22; [D.E. 97-2] ¶ 22; Ex. 40 [D.E. 91-31] 22; Judge Dep. [D.E. 91-68] 26; Daniel Dep. [D.E. 91-72] 15.

Optima Tobacco initially was responsible for creating the private-label cigarette design (i.e., packaging, filtration, etc.) and worked with KneX, a separate company which Makepeace owned, to do so. See [D.E. 91-2] ¶ 18; Judge Dep. [D.E. 91-68] 16, 19. Optima Tobacco also created the Sheriff, Patrol, and Smoking Gun brands of private-label cigarettes. See [D.E. 97-2] ¶ 19; Judge Dep. [D.E. 91-68] 19–20. Among these three brands, the Sheriff brand comprised most of what UETA ordered. See [D.E. 97-2] ¶ 19; [D.E. 91-63] 7.

UETA became uncomfortable with this informal arrangement, and in 2010, requested that the parties draft a written contract to define their rights and duties. See [D.E. 91-2] ¶¶ 25–26; Judge Dep. [D.E. 91-68] 23; Daniel Dep. [D.E. 91-72] 15.[1] UETA made this request because it wanted to have an exclusive agreement with U.S. Flue-Cured. See [D.E. 91-20] ¶ 26; Daniel Dep. [D.E. 91-72] 15. U.S. Flue-Cured also wanted a written contract because Optima Tobacco represented a substantial portion of its business. See [D.E. 91-2] ¶ 26.[2] Thus, on June 27, 2011, U.S. Flue-Cured circulated a first draft of a written contract that all three parties would sign in 2012 ("the 2012 agreement"). See id. ¶ 29; Ex. 14 [D.E. 91-11] 1–16.

The parties dispute several aspects of the negotiating process that led to the 2012 agreement. According to defendants, Optima Tobacco "tried to keep the two 'contracts' separate in an effort to keep its margins confidential" because Optima Tobacco knew that "UETA (if not also [U.S. Flue-Cured]) would be upset" about Optima Tobacco's high margins. [D.E. 91-2] ¶ 27. Defendants also assert that Judge falsely told UETA that UETA could not contact U.S. Flue-Cured directly. See id. ¶

---

[1] The parties drafted a memorandum of understanding dated April 11, 2011. See Ex. 10 [D.E. 91-8]. However, the parties did not sign this document. See Judge Dep. [D.E. 91-68] 52.

[2] The parties dispute precisely how much of U.S. Flue-Cured's business this arrangement produced. Compare [D.E. 91-2] ¶ 26, with [D.E. 97-2] ¶ 26.

3

28; Ex. 2 [D.E. 94-2]; Ex. 72 [D.E. 94-72]. In contrast, Optima Tobacco claims that U.S. Flue-Cured knew Optima Tobacco's margins but did not care. See [D.E. 97-2] ¶ 27; Daniel Dep. [D.E. 91-72] 57 (stating that making tobacco is the "easiest thing" in the tobacco industry while selling it is the "hardest thing"). Although Optima Tobacco concedes that it did not want UETA and U.S. Flue-Cured to contact each other directly, Optima Tobacco claims that it feared that defendants would exclude it from the arrangement, not that it wanted to keep its margins secret. See [D.E. 97-2] ¶ 28; cf. Judge Dep. [D.E. 91-68] 44.

Defendants retained counsel to negotiate and draft the 2012 agreement, which went through several rounds of revisions. See [D.E. 91-2] ¶ 30; Exs. 13–30 [D.E. 91-13–91-30] (e-mails and drafts of the 2012 agreement). Optima Tobacco did not retain counsel. See [D.E. 91-2] ¶ 31; Judge Dep. [D.E. 91-68] 28–29. Instead, Judge personally reviewed all proposed modifications to the drafts of the 2012 agreement and accepted all changes that UETA or U.S. Flue-Cured proposed. See Judge Dep. [D.E. 91-68] 28–29. Judge "had complete faith that the contract would be fine" and did not "recall specifically offering edits to the contract." Id. at 29.

The parties highlight the drafting process of several clauses in the 2012 agreement. First, the draft agreements only contained one price per carton labeled as the "UETA Purchase Price." [D.E. 91-2] ¶ 32. It was initially unclear to the parties, however, whether the "UETA Purchase Price" was the price that UETA paid to Optima Tobacco or the price that Optima Tobacco paid to U.S. Flue-Cured. See id. ¶ 33. Second, the "whereas" clauses of the drafts did not mention Optima Tobacco. See id. ¶ 34. Third, an introductory clause stated that Optima Tobacco was a party. See [D.E. 97-2] ¶ 34; Ex. 30 [D.E. 91-26] 1; Ex. 16 [D.E. 91-13] 3. Fourth, although an earlier draft provided that U.S. Flue-Cured would pay Optima Tobacco a percentage commission, see Ex. 17 [D.E. 91-14] 9–10, U.S. Flue-Cured replaced that term with an express statement that U.S. Flue-Cured would not be responsible for compensating Optima Tobacco under the 2012 agreement. See [D.E. 91-2] ¶ 35; Ex. 18 [D.E. 91-18] 9; Ex. 30 [D.E. 91-26] 8; Judge Dep. [D.E. 91-68] 60; Gewirtz Dep. [D.E. 91-

4

70] 58–60; Daniel Dep. [D.E. 91-72] 18. Finally, UETA proposed that the parties change the modification clause and termination clause of the draft to read that "both parties" could modify the 2012 agreement and that "either party" could terminate the 2012 agreement, respectively. See id. ¶ 36; Ex. 22 [D.E. 91-18] 13, 16.[3] Before this change, the termination clause had read that "any party" could terminate the 2012 agreement. See [D.E. 91-2] ¶ 36.

During negotiations, Judge told UETA that U.S. Flue-Cured required at least $2.16 per carton from Optima Tobacco. See id. ¶ 37; Ex. 20 [D.E. 91-16]. Judge also stated that U.S. Flue-Cured was receiving offers as high as $2.25 per carton from Mexican distributors. See Ex. 20 [D.E. 91-16]; Ex. 21 [D.E. 91-17] 2. According to defendants, these representations were false. See [D.E. 91-2] ¶ 37. Optima Tobacco disputes that Judge's representations were false and claims that Judge believed U.S. Flue-Cured had received such offers from Mexican distributors. See [D.E. 97-2] ¶ 37; see also Daniel Dep. [D.E. 91-72] 38; Judge Dep. [D.E. 91-68] 62–63. Moreover, Optima Tobacco claims that it requested a price increase from UETA so that it could increase its payments to U.S. Flue-Cured. See [D.E. 97-2] ¶ 37.

In September 2012, the parties executed the 2012 agreement. See [D.E. 91-2] ¶ 38; Ex. 30 [D.E. 91-26] 16. Among other provisions, the 2012 agreement contained a five-year term, subject to renewal for a sixth year. See Ex. 30 [D.E. 91-26] 10. The 2012 agreement stated that UETA would exclusively purchase cigarettes through the arrangement. See id. at 2–3, 19. UETA also promised to pay Optima Tobacco $2.24 per carton for the Sheriff brand of cigarettes and $2.16 per carton for the other two brands. See id. at 22.

The 2012 agreement's introductory clause stated that Optima Tobacco was a party. See id. at 1. Article 7 imposed various duties on Optima Tobacco, including that Optima Tobacco act as a "customer service liaison" between UETA and U.S. Flue-Cured. See id. at 6–7. Article 7 also

---

[3] Optima Tobacco disputes that the parties intended these modifications to exclude Optima Tobacco. See [D.E. 97-2] ¶ 36.

5

expressly stated that U.S. Flue-Cured would not be responsible for compensating Optima Tobacco for its performance under the 2012 agreement. See id. at 7. Under Article 12.3, "either party" could terminate the 2012 agreement in the event of material breach, impossibility of performance, or frustration of purpose. See id. at 10–11. Furthermore, the 2012 agreement expressly superseded all previous oral or written agreements. See id. at 15 ¶ 14.12; [D.E. 91-2] ¶¶ 38(m), (n).

After the 2012 agreement, Optima Tobacco and U.S. Flue-Cured continued to use an oral agreement to define their relationship. See id. ¶¶ 39, 48; Daniel Dep. [D.E. 91-72] 20; Morgan Dep. [D.E. 91-71] 19. This oral agreement was terminable at will, and U.S. Flue-Cured could demand a higher price at any time. See [D.E. 91-2] ¶¶ 39, 47; [D.E. 97-2] ¶ 39; Judge Dep. [D.E. 91-68] 27, 90; Daniel Dep. [D.E. 91-72] 28, 44.

Optima Tobacco did not disclose to UETA the specific price that it paid U.S. Flue-Cured. See [D.E. 91-2] ¶ 40; Ex. 121 [D.E. 91-64] 3.[4] However, U.S. Flue-Cured knew the price that UETA paid to Optima Tobacco, and Judge told Daniel that the difference between the two prices was "Optima's operating profit from which [Optima Tobacco] pay[s] Aaron [Gewirtz] and other expenses." Ex. 31 [D.E. 91-27]; see Ex. 96 [D.E. 91-54]. Daniel did not share the 2012 agreement with anyone else at U.S. Flue-Cured, other than an employee who worked directly under him. See [D.E. 91-2] ¶ 41.

Shortly after executing the 2012 agreement, Daniel asked Judge to clarify whether, under the 2012 agreement, Optima Tobacco would pay U.S. Flue-Cured $2.24 per carton. See id. ¶ 42; Ex. 31 [D.E. 91-27]; Daniel Dep. [D.E. 91-72] 20, 45. Judge clarified that $2.24 per carton was what UETA would pay Optima Tobacco, not what Optima Tobacco would pay U.S. Flue-Cured. See

---

[4] UETA claims that it "could not discern how (or even whether)" Optima Tobacco received compensation under the 2012 agreement. [D.E. 91-2] ¶ 40. Optima Tobacco concedes that UETA did not know the specific price that U.S. Flue-Cured charged Optima Tobacco for cigarettes, but argues that UETA knew that Optima Tobacco received some form of compensation from the arrangement between the parties. See [D.E. 97-2] ¶ 40. UETA does not contest that it knew that the arrangement generated some form of compensation for Optima Tobacco. See [D.E. 100-2] 15.

[D.E. 91-2] ¶ 42; [D.E. 97-2] ¶ 42. Under Optima Tobacco and U.S. Flue-Cured's contemporaneous oral agreement, Optima Tobacco would pay $1.95 per carton to U.S. Flue-Cured. See [D.E. 91-2] ¶ 49. Accordingly, after executing the 2012 agreement, Optima Tobacco's margin was $0.29 per carton. Cf. id. ¶¶ 42, 49. As before the 2012 agreement, Optima Tobacco always received payment from UETA before Optima Tobacco paid U.S. Flue-Cured. See [D.E. 97-2] ¶ 45; Judge Dep. [D.E. 91-68] 37–38.

In 2013, U.S. Flue-Cured terminated Daniel. See [D.E. 91-2] ¶ 49; Judge Dep. [D.E. 91-68] 31–32; Daniel Dep. [D.E. 91-72] 25; Thompson Dep. [D.E. 91-73] 8. However, U.S. Flue-Cured continued to sell private-label cigarettes to Optima Tobacco at $1.95 per carton. See [D.E. 91-2] ¶ 49; Morgan Dep. [D.E. 91-71] 16–17. At this time, UETA was U.S. Flue-Cured's largest customer. See Morgan Dep. [D.E. 91-71] 15.

In September 2013, Ron Morgan ("Morgan") replaced Daniel and became the new Executive Vice President of U.S. Flue-Cured. See [D.E. 91-2] ¶ 50; Morgan Dep. [D.E. 91-71] 7, 12; Thompson Dep. [D.E. 91-73] 9. Morgan sought to make U.S. Flue-Cured more profitable and to improve U.S. Flue-Cured's operations. See Morgan Dep. [D.E. 91-71] 14–16; see also Thompson Dep. [D.E. 91-73] 15. Morgan soon had concerns about U.S. Flue-Cured's relationship with Optima Tobacco and UETA because he suspected that U.S. Flue-Cured was losing money on the arrangement. See Morgan Dep. [D.E. 91-71] 14–16. Morgan requested an internal financial analysis of the arrangement, which confirmed that U.S. Flue-Cured was losing money under the arrangement and that U.S. Flue-Cured needed to receive $2.19 per carton to make the arrangement profitable for U.S. Flue-Cured. See id. at 20; MacDonald Aff. [D.E. 91-76] ¶¶ 7–8.

In July 2014, Morgan found a copy of the 2012 agreement in Daniel's files. See [D.E. 91-2] ¶ 51; Morgan Dep. [D.E. 91-71] 15; Thompson Dep. [D.E. 91-73] 14; Hubbard Dep. [D.E. 91-75] 9. Previously, Morgan had not known that there was a written agreement governing the business arrangement among the parties. See [D.E. 91-2] ¶ 51; Morgan Dep. [D.E. 91-71] 15 (stating "no one

really had the contract"). Morgan and Donald Hubbard ("Hubbard"), U.S. Flue-Cured's Purchasing Manager, understood the 2012 agreement to require Optima Tobacco to pay U.S. Flue-Cured $2.24 per carton and to renegotiate the rate annually (which had not occurred). See [D.E. 91-2] ¶ 52; Morgan Dep. [D.E. 91-71] 17–18; Hubbard Dep. [D.E. 91-75] 11. Morgan spoke with other U.S. Flue-Cured employees and discovered that Daniel told them that Optima Tobacco would pay only $1.95 per carton. See [D.E. 91-2] ¶ 53; Morgan Dep. [D.E. 91-71] 16–17; Daniel Dep. [D.E. 91-72] 20. Thus, after updating Stuart Thompson ("Thompson"), the CEO of U.S. Flue-Cured, Morgan arranged a meeting with Judge to discuss the parties' arrangement. See [D.E. 91-2] ¶¶ 55–56; Hubbard Dep. [D.E. 91-75] 11, 13–15.

On July 24, 2014, Morgan and Hubbard met with Judge. See [D.E. 91-2] ¶ 58; Hubbard Dep. [D.E. 91-75] 11, 13–15; Morgan Dep. [D.E. 91-71] 20, 29, 45; Judge Dep. [D.E. 91-68] 34–36; Ex. 89 [D.E. 91-48] 2; Judge Aff. [D.E. 97-3] ¶ 6. The parties dispute what happened at the meeting. According to defendants, Morgan told Judge that the 2012 agreement required Optima Tobacco to pay $2.24 per carton to U.S. Flue-Cured and demanded that Optima Tobacco do so. See [D.E. 91-2] ¶ 59; Thompson Dep. [D.E. 91-73] 33. After Judge explained that the 2012 agreement only governed the price that UETA was to pay Optima Tobacco, not the price that Optima Tobacco was to pay U.S. Flue-Cured, defendants claim that Morgan repeated his request that Optima Tobacco pay U.S. Flue-Cured $2.24 per carton. See [D.E. 91-2] ¶ 21. However, at some point, Morgan stated that U.S. Flue-Cured would accept payment of $2.18 per carton. See id. ¶¶ 60–63. In any event, Judge and Morgan eventually agreed to a new rate of $2.05 per carton, which Optima Tobacco claims was merely temporary and contingent upon Optima Tobacco obtaining a price increase from UETA. See [D.E. 97-2] ¶¶ 60–61; [D.E. 91-2] ¶ 66; Judge Dep. [D.E. 91-68] 35–36, 91; Morgan Dep. [D.E. 91-71] 21; Thompson Dep. [D.E. 91-73] 33; Hubbard Dep. [D.E. 91-75] 13–15. Defendants dispute that this price increase was temporary or contingent upon UETA agreeing to increase its payments to Optima Tobacco. See [D.E. 91-2] ¶ 67.

Optima Tobacco paid U.S. Flue-Cured the new rate of $2.05 per carton from July 2014 until March 2015. See [D.E. 91-2] ¶ 60; Ex. 86 [D.E. 91-46]; Morgan Dep. [D.E. 91-71] 21, 30. However, the parties dispute whether Morgan stated at the meeting on July 24, 2014, that the $2.05 per carton price was insufficient to retain U.S. Flue-Cured's business or if Morgan requested a price increase after the meeting. Compare [D.E. 91-2] ¶ 68, with [D.E. 97-2] ¶ 68. When Morgan returned to U.S. Flue-Cured, Morgan told Thompson that he demanded $2.24 per carton rate and that Optima Tobacco refused to pay that rate but agreed to pay $2.05 per carton. See [D.E. 91-2] ¶ 70.

After the meeting on July 24, 2014, Judge contacted Gewirtz to negotiate a price increase from UETA. See id. ¶ 71. Judge also told Hubbard that he could negotiate a price increase from UETA. See id. On August 14, 2014, however, Gewirtz told Judge that UETA refused to increase its payment rate to Optima Tobacco. See id. ¶ 72; Gewirtz Aff. [D.E. 91-79] ¶¶ 9–14; cf. Ex. D, Gewirtz Aff. [D.E. 91-79] 7.[5] UETA did not change its payment. See Gewirtz Aff. ¶ 14.

By September 2014, U.S. Flue-Cured and UETA were speaking directly. See [D.E. 91-2] ¶¶ 74–75. At the same time, according to Optima Tobacco, Optima Tobacco was awaiting UETA's response to Judge's proposed price increase. See [D.E. 97-2] ¶ 75. On or about September 17, 2014, Thompson began to negotiate with Leon Falic ("Falic") at UETA to establish a direct relationship between U.S. Flue-Cured and UETA. See [D.E. 91-2] ¶ 76; Thompson Dep. [D.E. 91-73] 28–30. Thompson disclosed the $2.05 per carton rate to Falic, which was the first time that UETA learned the rate that Optima Tobacco was paying to U.S. Flue-Cured. See [D.E. 91-2] ¶ 77.[6]

---

[5] Optima Tobacco disputes that Gewirtz and UETA rejected Judge's request. See [D.E. 97-2] ¶ 72. Although the parties agree that Judge never told Morgan that UETA had refused any price increase, the parties dispute whether Judge believed that UETA had rejected his proposal and whether UETA had done so. Compare [D.E. 91-2] ¶ 73, with [D.E. 97-2] ¶ 73; see also Judge Aff. [D.E. 97-3] ¶¶ 23–24; Gewirtz Aff. ¶¶ 9–14; [D.E. 100-2] 21–22.

[6] Although Optima Tobacco concedes that UETA only learned of the specific rate at this time, Optima Tobacco contends that UETA knew that Optima Tobacco's relationship with U.S. Flue-Cured was profitable before that date. See [D.E. 97-2] ¶ 77.

On September 26, 2014, Thompson sent Falic a draft agreement that excluded Optima Tobacco. See id. ¶ 78; Ex. 67 [D.E. 91-39]. Over the next several months, U.S. Flue-Cured and UETA negotiated a new contract without Optima Tobacco. See [D.E. 91-2] ¶ 79; see, e.g., Ex. 80 [D.E. 91-43]. During the negotiations, U.S. Flue-Cured stated that the original $1.95 per carton rate was an "artifact" from U.S. Flue-Cure's prior management. [D.E. 91-2] ¶ 80; Ex. 110 [D.E. 91-62] 2. Optima Tobacco never contacted U.S. Flue-Cured about its negotiations with UETA to secure a price increase. See [D.E. 91-2] ¶ 81; cf. Morgan Dep. [D.E. 91-71] 31.

On March 1, 2015, U.S. Flue-Cured and UETA executed a new contract that created a direct relationship between them ("the 2015 agreement"). See id. ¶ 82; Ex. 34 [D.E. 94-34]; Ex. 68 [D.E. 91-40] 16; see also Ex. 67 [D.E. 91-39]; Ex. 68 [D.E. 91-40]; Ex. 76 [D.E. 91-41]. Under the terms of the 2015 agreement, UETA promised to pay U.S. Flue-Cured a specific rate per carton in years 1 and 2, with an increase in following years. See [D.E. 91-2] ¶ 90; Ex. 68 [D.E. 91-40] 20; see also Ex. 83 [D.E. 91-44]; Ex. 84 [D.E. 91-45].[7]

On March 24, 2015, U.S. Flue-Cured sent a letter to Optima Tobacco notifying it that the 2012 agreement "was terminated effective March 1, 2015," and that "Optima will no longer be involved" with the business relationship between UETA and U.S. Flue-Cured. [D.E. 91-2] ¶ 83; Ex. 34 [D.E. 94-34]. The parties dispute the effect of the 2015 agreement on the 2012 agreement and on the oral agreement between U.S. Flue-Cured and Optima Tobacco. According to defendants, the March 24, 2015, letter terminated both the 2012 agreement and the oral agreement. See [D.E. 91-2] ¶ 83. According to Optima Tobacco, U.S. Flue-Cured's March 24, 2015 letter did not terminate the 2012 agreement because that the 2012 agreement had a five-year term and defendants did not follow the procedures in the 2012 agreement's termination clause. See [D.E. 97-2] ¶ 83. After Judge received the letter, he did not contact U.S. Flue-Cured about it. See [D.E. 91-2] ¶ 85.

---

[7] The court knows the rate in the 2015 agreement. Because UETA and U.S. Flue-Cured continue to operate under the 2015 agreement and the rate is confidential business information, the court has not included the rate in this order.

10

U.S. Flue-Cured sent 225 invoices to Optima Tobacco between September 2012 and July 2014 requesting payment at the $1.95 per carton rate. See id. ¶ 88; Ex. A, Parham Aff. [D.E. 91-77] 4–15. U.S. Flue-Cured also sent 84 invoices to Optima Tobacco between July 2014 and March 2015 requesting payment at the $2.05 per carton rate. See [D.E. 91-2] ¶ 88. According to U.S. Flue-Cured, U.S. Flue-Cured lost over $1,500,000 between May 2012 and March 2015 on cigarettes sold to Optima Tobacco. See id. ¶ 89. Defendants claim that Judge primarily performed all work for Optima Tobacco and that Optima Tobacco derived substantial profits from minimal efforts. See id. ¶¶ 91–96. Optima Tobacco, by contrast, claims that its duties were not as limited as defendants contend. See [D.E. 97-2] ¶¶ 91–96. Optima Tobacco seeks damages that it allegedly suffered because of defendants' alleged breach of the 2012 agreement. See [D.E. 91-2] ¶¶ 98–108.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007).

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient...." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

Subject-matter jurisdiction is based on diversity of citizenship, and the parties agree that North Carolina law applies. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[8] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

---

[8] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

A.

Optima Tobacco alleges that defendants breached the 2012 agreement. See Compl. [D.E. 8] ¶¶ 55–73. In support of their motions for summary judgment, defendants make two arguments. First, defendants argue that they are not liable for breach of contract. See [D.E. 91-1] 15–19; [D.E. 93] 19–20. Second, defendants argue that Optima Tobacco cannot prove its lost profits with reasonable certainty, and thus, can recover only nominal damages even if defendants are liable for breach of contract. See [D.E. 91-1] 19–30; [D.E. 93] 12–19.

Under North Carolina law, Optima Tobacco must prove (1) the existence of a valid contract and (2) a breach of the terms of the contract. See McLamb v. T.P. Inc., 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005); Cater v. Barker, 172 N.C. App. 441, 445, 617 S.E.2d 113, 116 (2005), aff'd, 360 N.C. 357, 625 S.E.2d 778 (2006); Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). A breach of contract occurs when there is "non-performance, unless the person charged shows some valid reason which may excuse the non-performance; and the burden of doing so rests upon him." Abbington SPE, LLC v. U.S. Bank, Nat'l Ass'n, 352 F. Supp. 3d 508, 517 (E.D.N.C. 2016) (alterations and quotations omitted), aff'd, 698 F. App'x 750 (4th Cir. 2017) (per curiam) (unpublished); see Cater, 172 N.C. App. at 447, 617 S.E.2d at 117; City of Fayetteville v. Sec. Nat'l Ins. Co., No. 5:18-CV-331-D, 2019 WL 3315201, at *4 (E.D.N.C. July 23, 2019) (unpublished); Barbour v. Fid. Life Ass'n, 361 F. Supp. 3d 565, 572 (E.D.N.C. 2019).

1.

As for Optima Tobacco's claim against UETA, UETA argues that the 2012 agreement did not obligate it to compensate Optima Tobacco and that Optima Tobacco's damages, if any, must arise under its oral agreement with U.S. Flue-Cured, to which UETA is not a party. See [D.E. 93] 19–20. Optima Tobacco responds that UETA "breached [Article 8.3 of the 2012 agreement] by not negotiating the [UETA Purchase Price] with Optima [Tobacco] in good faith." [D.E. 97-1] 9. In Optima Tobacco's complaint, however, Optima Tobacco alleges that UETA breached the 2012

13

agreement by "submitting purchase orders to Defendant U.S. Flue-Cured in direct violation" of the 2012 agreement. Compl. [D.E. 8] ¶ 59; see id. ¶ 67. Although Optima Tobacco generally alleges that defendants colluded to exclude Optima Tobacco from the business arrangement between UETA and U.S. Flue-Cured, Optima Tobacco does not allege that UETA breached a duty to negotiate the UETA purchase price in good faith. See id. ¶¶ 55–73; cf. Ex. 40 [D.E. 91-31] 9.

"It is well-established that parties cannot amend their complaints through briefing or oral advocacy." S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013); see U.S. ex rel. Carter v. Halliburton Co., 866 F.3d 199, 210 n.6 (4th Cir. 2017); Murray Energy Corp. v. Admin. of Envt'l Protection Agency, 861 F.3d 529, 537 n.5 (4th Cir. 2017); vonRosenberg v. Lawrence, 849 F.3d 163, 167 n.1 (4th Cir. 2017); Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009); Hexion Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105-D, 2011 WL 4527382, at *7–8 (E.D.N.C. Sept. 28, 2011) (unpublished) (collecting cases). This principle makes sense because a "party's complaint puts its opponent and the court on notice of the claims in the case." Hexion Specialty Chems., Inc., 2011 WL 4527382, at *8. Thus, to the extent that Optima Tobacco now seeks to allege a claim for breach of contract against UETA based on Article 8.3 of the 2012 agreement, see Ex. 30 [D.E. 91-26] 7, such a claim would "require[] proving a separate set of facts than required to prove [Optima Tobacco's] original allegations." vonRosenberg, 948 F.3d at 167 n.1. Optima Tobacco cannot amend its complaint through summary-judgment briefing.

This court's scheduling order expressly stated that any motion to amend pleadings "filed after March 30, 2018, must meet the standards" of Rules 15 and 16 of the Federal Rules of Civil Procedure. [D.E. 79] 2. But if "a party could amend its complaint via summary-judgment briefing, Rules 15 and 16 would be meaningless[.]" Hexion Specialty Chems., Inc., 2011 WL 4527382, at *8. Because Optima Tobacco did not properly amend its complaint, the court does not consider Optima Tobacco's new theory that UETA breached article 8.3 of the 2012 agreement.

14

As for Optima Tobacco's claim that the 2012 agreement required UETA to send all purchase orders to U.S. Flue-Cured through Optima Tobacco, Article 8.1 stated that "[p]roducts may be ordered by [UETA] only pursuant to written Purchase Orders submitted to [Optima Tobacco]." Ex. 30 [D.E. 91-26] 7. Viewing the evidence in the light most favorable to Optima Tobacco, UETA ordered products pursuant to written purchase orders that UETA submitted directly to U.S. Flue-Cured in violation of Article 8.1. See, e.g., id.; Morgan Dep. [D.E. 91-71] 24, 59; Daniel Dep. [D.E. 91-72] 64; Hubbard Dep. [D.E. 91-75] 17, 37–38. Genuine issues of material fact preclude summary judgment. Accordingly, the court denies UETA's motion for summary judgment as to liability on Optima Tobacco's breach of contract claim.

2.

As for Optima Tobacco's breach of contract claim against U.S. Flue-Cured, Article 6 of the 2012 agreement did not require U.S. Flue-Cured to operate exclusively through Optima Tobacco. See Ex. 30 [D.E. 91-26] 6. Article 8.1 similarly only required UETA, not U.S. Flue-Cured, to send purchase orders to Optima Tobacco. See id. at 7. Furthermore, Article 7.2 expressly stated that U.S. Flue-Cured was not "responsible for the payment of compensation to [Optima Tobacco]." Id. Thus, no reasonable jury could find that U.S. Flue-Cured breached any duties to Optima Tobacco under the 2012 agreement as alleged in the complaint. Rather, the oral agreement between U.S. Flue-Cured and Optima Tobacco defined U.S. Flue-Cured's duties to Optima Tobacco, and the oral agreement was terminable at will. See [D.E. 91-2] ¶¶ 39, 47; [D.E. 97-2] ¶ 39, 47. Moreover, on March 24, 2015, U.S. Flue-Cured terminated its oral agreement with Optima Tobacco. See [D.E. 91-2] ¶ 83; Ex. 34 [D.E. 94-34] (stating that "Optima will no longer be involved with the purchase orders, invoices or other matters related to the" 2015 agreement); [D.E. 101-3] ¶ 17.[9] Accordingly, for U.S. Flue-Cured to "invoic[e] and ship[] cigarettes directly to" UETA did not breach any duties that U.S.

---

[9] To the extent that Optima Tobacco now argues that U.S. Flue-Cured did not terminate the oral agreement, see [D.E. 97-1] 20, no rational jury could so find.

Flue-Cured owed to Optima Tobacco under the 2012 agreement. Compl. [D.E. 8] ¶ 59.

In opposition to this conclusion, Optima Tobacco suggests that U.S. Flue-Cured breached the 2012 agreement by interfering with Optima Tobacco's ability to negotiate with UETA in good faith as required by article 8.3 of the 2012 agreement. See [D.E. 97-1] 9, 18–19; Ex. 30 [D.E. 91-26] 7. As with Optima Tobacco's claim based on article 8.3 against UETA, Optima Tobacco cannot amend its complaint through summary-judgment briefing. See Halliburton Co., 866 F.3d at 210 n.6; Murray Energy Corp., 861 F.3d at 537 n.5; vonRosenberg, 849 F.3d at 167 n.1; S. Walk at Broadlands Homeowner's Ass'n, Inc., 713 F.3d at 184; Hexion Specialty Chems., Inc., 2011 WL 4527382, at *1. "This theory [of breach of contract] differs from that alleged in the complaint." vonRosenberg, 849 F.3d at 167 n.1. Moreover, Optima Tobacco appears to concede that it would be "illogical[]" to read article 8.3 to apply to U.S. Flue-Cured. [D.E. 97-1] 18. Thus, the court declines to consider any claim against U.S. Flue-Cured under article 8.3 of the 2012 agreement.

Even viewing the evidence in the light most favorable to Optima Tobacco, no reasonable jury could find that U.S. Flue-Cured breached the 2012 agreement as alleged in Optima's complaint. See Sale v. State Highway & Pub. Works Comm'n, 242 N.C. 612, 619, 89 S.E.2d 290, 296 (1955) ("In the obligations assumed by a party to a contract is found his duty, and his failure to comply with the duty constitutes the breach."); Samost v. Duke Univ., 226 N.C. App. 514, 518, 742 S.E.2d 257, 260 (2013) (same); cf. Hacker v. Wells Fargo Bank, N.A., No. 4:15-CV-163-BR, 2016 WL 5678341, at *6 (E.D.N.C. Sept. 30, 2016) (unpublished). Accordingly, the court grants U.S. Flue-Cured's motion for summary judgment.[10]

B.

UETA argues that Optima Tobacco cannot recover lost profits. See [D.E. 93] 12–19. Under North Carolina law, the party seeking lost profits bears the burden of proof, and to meet that burden, a party "must prove such losses with reasonable certainty." McNamara v. Wilmington Mall Realty

---

[10] The court does not address U.S. Flue-Cured's remaining arguments.

Corp., 121 N.C. App. 400, 407, 466 S.E.2d 324, 329 (1996) (quotation omitted); see Olivetti Corp. v. Ames Bus. Sys., Inc., 319 N.C. 534, 546, 356 S.E.2d 578, 585 (1987); Castle McCulloch, Inc. v. Freedman, 169 N.C. App. 497, 501, 610 S.E.2d 416, 420 (2005), aff'd, 360 N.C. 56, 620 S.E.2d 674 (2005) (per curiam); Iron Steamer, Ltd. v. Trinity Restaurant, Inc., 110 N.C. App. 843, 847, 431 S.E.2d 767, 770 (1993); Ross v. Washington Mut. Bank, 566 F. Supp. 2d 468, 482–83 (E.D.N.C. 2008), aff'd sub nomen Ross v. Fed. Deposit Ins. Corp., 625 F.3d 808 (4th Cir. 2010). Whether a party's evidence meets the "reasonable certainty" standard is a question of law for the court. See Olivetti, 319 N.C. at 548, 356 S.E.2d at 586–87; Iron Steamer, 110 N.C. App. at 848, 431 S.E.2d at 770–71. Although absolute certainty or a precise figure is not required, "damages for lost profits will not be awarded based on hypothetical or speculative forecasts." Castle McCulloch, 169 N.C. App. at 501, 610 S.E.2d at 420 (quotation omitted); see Pipkin v. Thomas & Hill, Inc., 298 N.C. 278, 287, 258 S.E.2d 778, 785 (1979); Beroth Oil Co. v. Whiteheart, 173 N.C. App. 89, 95, 618 S.E.2d 739, 744–45 (2005); McNamara, 121 N.C. App. at 407–10, 466 S.E.2d at 329–32; Iron Steamer, 110 N.C. App. at 847–48, 431 S.E.2d at 770–71. A party seeking to recover lost profits cannot do so if the party's estimate "is based on assumptions that are purely speculative in nature." Iron Steamer, Ltd., 110 N.C. App. at 849, 431 S.E.2d at 771.

Lost profits, like other breach of contract damages, must have been "in the contemplation of the parties when the contract was made." Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 292 N.C. 557, 560–61, 234 S.E.2d 605, 607 (1977) (quotation omitted); see Perfecting Serv. Co. v. Prod. Dev. & Sales Co., 259 N.C. 400, 415, 131 S.E.2d 9, 21 (1963). Whether the parties contemplated lost profits "depend[s] upon the information communicated or the knowledge of the parties at the time and the reasonable foreseeability of such damages." Troitino v. Goodman, 225 N.C. 406, 412, 35 S.E.2d 277, 281–82 (1945) (collecting cases). Lost profits must be "the natural and proximate result of the breach." Mosley & Mosley Builders, Inc. v. Landin Ltd., 87 N.C. App. 438, 446, 361 S.E.2d 608, 613 (1987); see Perkins v. Langdon, 236 N.C. 159, 170, 74 S.E.2d 634, 643 (1953); Media

17

Network, Inc. v. Long Haymes Carr, Inc., 197 N.C. App. 433, 457, 678 S.E.2d 671, 687 (2009); S. Bldg. Maintenance, Inc. v. Osborne, 127 N.C. App. 327, 331–32, 489 S.E.2d 892, 895–96 (1997).

"While difficult to determine, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analysis, and business records of similar enterprises." Iron Steamer, 110 N.C. App. at 849, 431 S.E.2d at 771 (quotation omitted); see Ross, 566 F. Supp. 2d at 482. There is "no bright-line rule in determining what amount of evidence is sufficient to establish lost profits." Byrd's Lawn & Landscaping, Inc. v. Smith, 142 N.C. App. 371, 377–78, 542 S.E.2d 689, 693 (2001); see Beroth Oil Co., 173 N.C. App. at 95, 618 S.E.2d at 744. However, "[p]rofit estimates which are speculative or dependent on contingent circumstances not supported in the record are not admissible to prove . . . damages." Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275-D, 2011 WL 6748518, at *10 (E.D.N.C. Dec. 22, 2011) (unpublished) (quotations and alterations omitted); see, e.g., Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999); Tyger Const. Co. v. Pensacola Const. Co., 29 F.3d 137, 142–43 (4th Cir. 1994); Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21–22 (2d Cir. 1996) ("Where lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future prospects."); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 568–69 (D.C. Cir. 1993); In re Air Crash Disaster at N. Orleans, La., 795 F.2d 1230, 1234–35 (5th Cir. 1986).

In response to UETA's motion for summary judgment and in support of its claim for lost profits, Optima Tobacco relies on Dr. Jonathan Strickland's ("Strickland") expert report and deposition. See [D.E. 97-2] ¶¶ 99–100. Strickland opined that Optima Tobacco sustained $2,671,079 in lost profits between March 2015 and September 2017 because of UETA's alleged breach of the 2012 agreement. See [D.E. 91-2] ¶ 102; [D.E. 97-2] ¶ 102; Ex. 117 [D.E. 91-63] 4.

Strickland's opinion rests on speculative assumptions that do not fit the facts of this case. First, Strickland assumed that Optima Tobacco would have derived $0.29 per carton in profits under

18

the 2012 agreement only because Optima Tobacco's counsel told him to do so. See Ex. 136 [D.E. 91-74] 5, 7, 8–9, 11, 22, 39. However, this hypothetical profit rate conflicts with Strickland's understanding of the undisputed facts. See id. at 9; cf. Martin v. Bimbo Foods Bakeries Distribution, Inc., No. 5:14-CV-17-BR, 2016 WL 4621075, at *2–3 (E.D.N.C. Sept. 6, 2016) (unpublished). Indeed, Strickland conceded that there is "no question" that Optima Tobacco made less than $0.29 per carton in profits between July 2014 and March 2015. Ex. 136 [D.E. 91-74] 54–55; cf. Martin, 2016 WL 4621075, at *2; Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc., No. 5:03-CV-817-FL(2), 2005 WL 6000369, at *13 (E.D.N.C. May 4, 2005) (unpublished), aff'd, 183 F. App'x 267 (4th Cir. 2006) (per curiam) (unpublished). Second, Strickland conceded that whether UETA or U.S. Flue-Cured would have increased or decreased their prices after July 2014 was "speculation both ways." Strickland Dep. [D.E. 91-74] 38; see, e.g., [D.E. 94-73]. Thus, Strickland's analysis depends "on contingent circumstances not supported in the record[.]" Silicon Knights, Inc., 2011 WL 6748518, at *10. Because Strickland's "lost profit estimates for [Optima Tobacco's damages] are based on unreliable and speculative forecasts[,]" Optima Tobacco's "claims for lost profits ... are too speculative to be determined with reasonable certainty." Id. at *11; see, e.g., Martin, 2016 WL 4621075, at *2–3; Stillwagon v. Innsbrook Golf & Marina, LLC, No. 2:13-CV-18-D, 2014 WL 5871188, at *5–6 (E.D.N.C. Nov. 12, 2014) (unpublished); Castle McCulloch, 169 N.C. App. at 501–02, 610 S.E.2d at 420–21.

"Unsupported speculation is not sufficient to defeat a summary judgment motion." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987); see Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006); Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003); Beale, 769 F.2d at 214. Because Strickland's opinion is based on unsupported speculation, it does not create a genuine issue of material fact. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596 (1993) (If the trial court "concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude

19

that the position" is true, then "the court remains free ... to grant summary judgment.").

In opposition to this conclusion, Optima Tobacco argues that Judge, Morgan, and Hubbard intended the price increase that reduced Optima Tobacco's margin to $0.19 per carton to be temporary or contingent upon UETA's agreement to increase what UETA paid to Optima Tobacco. See Ex. 40 [D.E. 91-31] 9–10; Hubbard Dep. [D.E. 91-75] 38–39, 45–46. Even viewing the record in the light most favorable to Optima Tobacco, it remains speculative whether and to what degree UETA or U.S. Flue-Cured would have changed their prices. Optima Tobacco also did not produce evidence concerning when (if ever) the price would have reverted to $1.95 per carton. Accordingly, even viewing the evidence in the light most favorable to Optima Tobacco, the court grants summary judgment to UETA on Optima Tobacco's lost profits claim.[11] Optima Tobacco may seek nominal damages from UETA at trial. See HBC Adventures, LLC v. Holt MD Consulting, Inc., No. 5:06-CV-190-F, 2012 WL 4483625, at *6 (E.D.N.C. Sept. 27, 2012) (unpublished).

III.

In sum, the court GRANTS IN PART and DENIES IN PART defendants' motions for summary judgment [D.E. 90, 92], and DISMISSES U.S. Flue-Cured as a defendant. Optima Tobacco, U.S. Flue-Cured, and UETA shall engage in a settlement conference with United States Magistrate Judge Gates. The court will set the case for trial by separate order.

SO ORDERED. This _30_ day of September 2019.

JAMES C. DEVER III
United States District Judge

---

[11] The court does not reach UETA's remaining arguments concerning lost profits.